The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Thank you for coming today. We have three cases to argue and we will start with our first case, Geri-Care Pharmaceuticals v. Stradis Healthcare. Ms. Giroux, is that right? Whenever you're ready. Good morning. May it please the Court, my name is Danielle Giroux and I represent Geri-Care Pharmaceuticals Corporation. The District Court in this products liability action erred in granting summary judgment in favor of Stradis Healthcare on its implied indemnification claim against Geri-Care. This is not your typical scenario where a downstream seller or distributor that did nothing but move the product in the chain of distribution, then seeks to shift the liability to an upstream manufacturer. The facts here are very different. Here, both Stradis and Geri-Care took affirmative active steps and very similar steps in that chain of distribution that led to the claim damages of Carolink in this case. Both parties did not test the product. Both parties relied on a representation made by someone else that it was sterile. And in the case of Stradis, they also made an express warranty to Carolink, which was the party that ended up being damaged in this case. The District Court should have found that Stradis' actions were active and therefore precluded its implied indemnification claim or if there were disputed facts, it should have allowed the jury to decide whether Stradis' actions were in fact passive or active. It did not. The doctrine of implied indemnity is reserved for those individuals who are being held liable for the fault of another. Counsel, can I just ask you a quick threshold question? You're talking about Maryland law, right? I am, yes. And everybody agrees that Maryland law applies here? It does. There was significant discussion below in the District Court regarding the applicable law, and we did not challenge that on appeal. Yes, we are talking about that. Could I follow up on just one short question on that? Does Maryland law embrace the restatement second? Your Honor, I believe it does, and I believe that the District Court relied on that as well. You don't challenge that either? I do not. The doctrine of implied indemnification would not apply to this situation, to Stradis, who is not merely a conduit of the eyewash in the chain of distribution. There are facts in the record that support Stradis' active negligence in this case. Counsel, how much weight in considering this, how much weight do you think it is appropriate to give the allegations in the complaint as opposed to the factual record? I don't think that it's error to look at the facts in the complaint, but the court needed to, in deciding summary judgment, resolve all factual inferences in favor of the non-moving party, which it didn't. So you think you can look at both, the allegations and the complaint, but also the factual record? Yes, I do, in determining what facts exist to support either passive or active negligence. In this case, we argue that the District Court relied on the complaint, the allegations of the complaint, but ignored these other facts. But then the District Court came back, I thought, and actually agreed with you, I'm supposed to look at everything and did look at the facts. That is correct, yes, but still didn't look at, the way I interpret what the District Court did here is said two things. One is that it says Jerry Care is the manufacturer here, and because Jerry Care is the manufacturer, it was actively negligent, and Stratus, who was in the chain of distribution, was passively negligent. But didn't look at the other facts in this case, that Jerry Care argued that supported Stratus' active negligence in this case. The fact that it held itself out to be an expert in the field of iBanking. And it told CareLink, through its representations, that they were an ideal partner for implementing medical standards to your iBank operations, and our custom trays are designed to help recover the highest quality tissue in the most efficient way.  Now, the Court, in its opinion, ruling on Jerry Care's motion to reconsider on the indemnity, said at page 5 of its decision, any claim that Stratus should also be considered a manufacturer is insufficiently supported by the record to allow a jury to conclude that Stratus was also subject to a duty to inspect. That's correct. Are you claiming that they had a duty to inspect? If Jerry Care has a duty to inspect, then Stratus had a duty to inspect. My argument is that there is no way to distinguish factually from what Jerry Care failed to do with regard to inspection, and what Stratus failed to do with regard to inspection. But don't you have a... No, go ahead. I thought that manufacturers have a different duty to inspect. So Jerry Care is not a manufacturer of the eyewash. I understand for purposes of the sealed container defense that the Court found that Jerry Care was an apparent manufacturer. But that statute, the definition of manufacturer for sealed container defense, is much broader than just a manufacturer of the product itself. Well, Jerry Care held itself out as the manufacturer. It did hold itself out to be the manufacturer of the product. It did put on its label that it was a product of Korea. The problem was that to the public, they wouldn't know that Jerry Care wasn't in Korea and that it was a South Korean manufacturer that actually manufactured the eyewash, and that there was a California company that manufactured the eyewash. Jerry Care did not physically manufacture the eyewash. No. It worked with the manufacturers in order to develop this product for which it put its own private label on. How is that any different than what Stratis did in this case where they took the eyewash, they put it in their own surgical packs under their name, under their as a distributor and manufacturer which it held itself out to be, and put an insert inside of this product that said... I'm sorry. Stratis held itself out to be a manufacturer? Yes. A manufacturer of the Stratipaks. The Stratipaks. That said that they were the distributor and manufacturer. And that insert also said, included the phrase, that it was sterile eyewash. At no point did Stratis inspect the eyewash or test the eyewash before it made that separate express representation to CareLink in this case. So this isn't a situation where Stratis simply took the same product and then moved it from one place to another. Well, it kind of is. Isn't your argument, if you play it out, that with respect to the eyewash, that, you know, y'all are in the same boat. But someone upstream in Korea actually was the actual manufacturer. And then through a series of purchases and sales through the distribution stream, it ultimately gets to the end user. I forget who at CareLink, I think. But if that's what it is, aren't you liable as a distributor from an upstream distributor? I'm not sure I'm following. Am I liable? Is GeriCare liable? Stratis can go back. If both GeriCare and Stratis obtained the eyewash that was contaminated and passed it on and didn't inspect, and as you say they're in the same boat, doesn't the restatement of torts permit an upstream distributor to seek indemnity from a downstream distributor? Just like you could go downstream to the people you bought it from. Now, I realize that's not the district court's reasoning, but it seems like under your view of the facts, you run smack into that. And, you know, the district court actually did this under a strict liability theory, not a negligence theory, which seems like it's even a better vehicle to go that way. So I get your consternation about maybe there was some negligence there, maybe some negligence there. Perhaps the active-passive thing may not be a perfect fit. But it seems like your argument leads to, you know, maybe a remand, maybe a reconsideration, or maybe us just deciding it on this is a classic, you know, two distributors, and you lose on that ground. The doctrine that I'm asking this court to consider is that it should not be a rule simply in where your placement is in the chain of distribution. That's exactly what the restatement of torts says. If it's true that the court has to consider passive versus active negligence, then it needs to be more than just where your placement is in the chain of distribution. You have to look at the actions, the relationship of each party to the party that was injured, and the nature of their legal duty. And in this case, it wasn't just simply someone passing the product down the line. It's that Stratus took that status. Well, imagine this wasn't this case. Imagine it was a absolute classic, you know, situation where there's no allegations that your client did any, you know, held itself out as a manufacturer. You just got it, passed it on. Stratus did the same thing. You know, same result here. It's contaminated. There's a verdict in favor or a judgment in favor of care length, and Stratus seeks indemnity from a downstream distributor. Do they get it? They do not. You don't think that restatement of torts that Maryland has adopted allows that? There needs to be more than just looking at the placement in line. There needs to be a consideration of the relationship of the parties and the steps that each party took to determine whether it was passive or active in this case. There could be two parties within that chain of distribution that were actively negligent, and I believe that is the case here. There could be an argument that Stratus was even more negligent than Jerry Care simply because of the representations that he made. So your point is that, you know, you're both joint tort feasors, neither gets indemnity, and the provisions of the restatement of torts that may suggest otherwise don't apply in Maryland? I'm not saying that they don't apply, but I'm suggesting that there needs to be a consideration of all the facts. In the case of the Max's case, I think that's why the Maryland Special Court of Appeals was so reluctant to even adopt a hard, fast rule when it came to implied indemnification claims. It's because there are so many different factual scenarios that arise in this context, and you can't just look at it from the placement of the line in the chain of distribution. Can I ask one more question? I'm sorry. But going back to the active-passive issue, I understand your position there, but if we were to look at this and agree with the district court that there's no genuine dispute of material fact about the level of active negligence, it sounds like you would agree in that scenario it would be appropriate to require indemnity. You just think there's a genuine dispute of material fact?  Either there's a genuine, either there are facts in the record that are undisputed that show that Stratis was actively negligent, or if there are disputed facts that would support active negligence, it was inappropriate for the district court to grant summary judgment and instead should have allowed the jury to decide whether Stratis was actively or passively negligent. I'd like to turn to the issue of attorney's fees. Should this court agree that Stratis is actively negligent, the argument on the attorney's fees is moot, but the district court did not err here, certainly did not abuse its discretion in denying Stratis' attorney's fees. There was no contract between Stratis and Jerry Care containing indemnification provision. Counsel, can I say I don't really understand that argument. I mean, having read NOVA research, it seems like that would cut in the other direction. Like if the contract actually said, here's an indemnity provision but neglected to include fees, it seems like there you might have a pretty good argument that you don't shift fees. But when you're implying the whole thing, it seems like you would just be implying the baseline rule, which in Maryland appears to be that you do get fees under an indemnification theory. I disagree that in the terms of the Maryland rule, is that you would get attorney's fees in an implied indemnification theory. The two cases that were cited by Stratis in their brief, Jones as well as NOVA, had to do with written agreements. I know, but that's not what the reasoning turned on. But you think it is. You think those cases are limited to a case where there is a contractual provision for indemnity that does not include fees. Well, in the Jones case, the way I read Jones is that there was a contractual provision, but it used the word losses. And the court said, read into that, that losses could be considered attorney's fees as well. And similarly with the NOVA case, it also included, it wasn't an implied indemnification case, but the court said with respect to the written agreement that you can read into that they implied that you would get the attorney's fees. But I do see what you're saying. Factually, those cases had a contract in them. But under Maryland law, the whole theory behind implied indemnity, these special cases, is that that is a quasi-contractual or an implied contract. But you're saying Maryland is going to have a different rule when it comes to a cause of action based on an Because that just doesn't seem sensible. I mean, if there's a written contract, you would look to the written contract. But apparently not. They will add in fees, even if it doesn't provide for it. If the party, if you can look to the written contract and decide, okay, when they said losses, does that mean that they meant attorney's fees, or what was the intent of the party with respect to this written contract, and did it cover attorney's fees? But if it's just a quasi-contract or an implied contract, you don't ask any of those questions. No, you wouldn't, because there is no contract. And the law in Maryland. But there's an implied contract. There's an implied contract, but there's no provision for fees. And under the Max's case, which addressed whether Maryland would apply, would allow for attorney's fees in this context, held that it would not, or very doubtful that it would in the context. But that was before this Nova case, right? That's when the Supreme Court, I thought, kind of straightened everything out. The Nova case was two years after the Max's case. The Nova case didn't even address the Max's case at all. But I would argue because the Nova case involved an actual written agreement between the parties, it's factually distinct from what the Max's case was discussing. And in this case, because the district court correctly found that because the claimed damages for which Jerry Care was required to indemnify, Stratis had to do with Care Link's damages, which didn't include attorney's fees, then Stratis could not recover those attorney's fees. Thank you very much. Thank you. May it please the Court. Kelly Lippincott on behalf of Stratis Healthcare, LLC. I want to look at what the undisputed facts are in this case. Counsel made reference to disputed facts, of which I'm not aware of any. The undisputed facts in this case is that Jerry Care held itself out as Eyewash's manufacturer. And there's, in terms of the active, passive negligence analysis, I'd like to go through what the various actions were of both Jerry Care and Stratis. First, as to Jerry Care. The first area of things that they did was in terms of labeling this product. This eyewash was manufactured and packaged by a South Korean manufacturer and by Carraway Products, Inc. There's a lot of detail in Jerry Care's corporate designee deposition that begins at Joint Appendix 436 that details how that relationship was formed. And their bottle that they have for their sterile eyewash is at JA 585. And the image of the box begins at Joint Appendix 592. And as you'll see from looking at both the label on the bottle and the packaging for that bottle, that was created pursuant to Jerry Care's contract with Carraway to manufacture the eyewash with Jerry Care's logo. Jerry Care became the exclusive seller of that eyewash. And the box that the eyewash came in and all the labeling on it was edited by Jerry Care. Jerry Care wanted Carraway to manufacture the product under Jerry Care's private label. Jerry Care wanted a sterile eyewash under private label as one of its own products to add to its product line. Jerry Care provided the logo and distribution statement. And that statement said it was distributed by Jerry Care and listed Jerry Care's address. Jerry Care's sterile eyewash provides on its label that it is distributed by Jerry Care Pharmaceutical. It makes no reference to any other company, entity, distributor, or manufacturer. And Jerry Care requested that Carraway make changes to the label, including edits to directions for use, changing the expiration date, and inserting comparisons to the national brand known as Balsham Long. Jerry Care wanted its label to be consistent with the label of the national brand. And it was consistent in terms of the uses stated on the label and warnings listed. This was Jerry Care's demand and request for its product. Jerry Care likes to sell products with its label so that their name is on the market. And Jerry Care reviewed the contents of the label both for the bottle of the eyewash and the box in which it was contained prior to approving it for use. Jerry Care specified to Carraway that the eyewash should be sterile. And the label stated on Jerry Care's eyewash that it is sterile eyewash irrigating solution. And that it was distributed by Jerry Care Pharmaceuticals Corp. Jerry Care specified that the sterile eyewash was to be consistent in terms of purposes, uses, warnings, and ingredients. That was what it did in terms of the labeling of the product. Now let's look at what it did in terms of FDA registration. Jerry Care's private label eyewash was registered with the FDA. Jerry Care identified itself as the labeler of the eyewash to the FDA when it registered it, pursuant to the Drug Listing Act of 1972. And it did not disclose to the public that Carraway or any other entity was the manufacturer of the eyewash. It did not want the public to have any other name in front of it except for Jerry Care. So, Counsel, if I could interrupt you a little bit on the facts. I appreciate all the information you're talking about and how that led to the apparent manufacturer conclusion. I'm trying to make sense of a situation, you know, when there is an apparent manufacturer who's not the manufacturer. I mean, factually, they didn't make it. I think that's clear, too. So, is your argument that because they're the apparent manufacturer, they have all the duties that a manufacturer has? Or are you saying they just did a bunch of bad stuff that makes them actively negligent? I would be amenable to both, Your Honor. What's the lull? What I am focusing on is the active versus passive analysis and how they are different. And I'm looking to see whether or not the actions of Jerry Care are significantly different from that of Stratus. And going through everything that they did in terms of the labeling specifications as to the product itself, its directions to care away, shows that Jerry Care's actions were significantly different from that of Stratus. Does it make sense for us to be looking at active and passive negligence when we have an indemnity claim based on strict liability? That just seems weird to me, that, you know, we've got strict liability. And strict liability questions whether the product's unreasonably dangerous. You're not looking at duty, breach duty, and yet here we are kind of weighing negligence. Somehow that seems weird. I understand what Your Honor is saying, but I don't see that the analysis for purposes of indemnification is necessarily, as you just characterized, a weighing of negligence. It's a weighing of the actions of the respective entities in what they did to determine whether or not their actions should be classified as active versus passive. I thought that the active-passive thing, like if you go up on level of generality, it's a question about culpability, and you weigh it based on active versus passive. But I guess if the inquiry is into culpability, why does that make sense in a strict liability case? It makes sense in this case because the strict liability analysis was just based on the fact that this is a product that's used in human eyes, and so strict liability is the analysis that's applied to figure out whether or not we are liable to the plaintiff in this case. Now the question as to whether or not two defendants have any obligation of indemnification to one another, that is where the active versus passive analysis comes into play. And differentiating the actions of the two entities... Okay, what is passive negligence? Passive negligence is what Stratis is going for. Oh, no, I understand that that's the position you're advocating. I'd like you to define passive negligence. Defining passive negligence, it's... Is it necessarily defined with regard to the other tort visa, or is passive negligence a concept that stands on its own? I would say both. One, I think it is a concept that stands on its own, and Stratis is certainly... Okay, so how do you define it then? If you're writing the opinion of the court, tell me how we should write what passive negligence is. Passive negligence is not affirmative conduct, but it is secondary conduct to what should be the indemnitor in that analysis. So, I'm sorry, that's a horrible definition. Let me try to repair that. But what has the passively negligent person, what do they do? In other words, in strict liability, you're not going to have a concept of duty, are you? In passive negligence, the party does not take affirmative steps other than, like in the case of Stratis, pass the product through. They pass the product through. They pass the warranty from the GeriCare bottle onto its packaging. It didn't have an active role in the development, the creation, the marketing of the product. Okay. So, GeriCare, in terms of its FDA registration, it did not disclose its identity. It didn't disclose the identity of any other entities. It used its own NDC number. So, counsel, it sounds like you, you know, the kind of maybe rabbit trail I went down with your colleague, that the restatement second allows an upstream distributor to go against the downstream distributor. It doesn't sound like you, like, allows, imagine no one here did anything other than just pass the contaminated eyewash on. It sounds like your position is that you would not be able to go against GeriCare had they not done all the stuff you said. Right. And there's another aspect of things that they did, and that was in terms of testing of the product. Yeah, I'm not debating the amount of stuff, but just a pass-through distributor can't go downstream to another pass-through distributor under Maryland law. Is that your position? Well, we've lost an in-source from this case. They were in between us and GeriCare. So, yeah, certainly I don't think that, I think your Honor is correct, that simply the location is not enough under Maryland law. Okay. But the actions of the respective parties is more than enough here. Okay. But Stratus labeled the surgical packs as including sterile eyewash. Yeah. How does that factor in your analysis? Because you're talking about just passing along in the stream of commerce, but they actually labeled this as sterile eyewash as part of its representation to the public. We called the product what it's called, and it's called sterile eyewash, and that's how we listed it. That's how it is described and labeled and identified on GeriCare's bottle and box that they created. We refer to it as sterile eyewash. It is sterile eyewash. It's supposed to be sterile eyewash. But the consumer looks at that and sees Stratus saying that this is sterile. Right. And we were relying on the representation of GeriCare. But isn't that roughly the theory on which you are arguing for the sealed container defense? Like, we didn't do anything. We just passed it on. But I thought the district court found and we affirmed that, no, the express warranty was like an additional thing you did. So how is that not active? Right. Not you, your client. Your Honor, I argued that when we were here last before this panel on this matter, and I argued that that was just, that was not an express warranty on our part. Right. But given that you were unsuccessful, I'm trying to figure out why isn't the express warranty the active negligence here. Express warranty is not active negligence. When you look at it against the actions of GeriCare, it's not. Less active negligence. Right. It's less active. It's not, well, I wouldn't say less active. It is passive. We are passing along a product. We are passing along a description of the product.   Can you let me ask a question? Thank you. And it goes back to Judge Keenan's question, I think. Is your answer that an express warranty is sort of per se standing alone, that is just passive? It's an express warranty, but it's passive? Or is it that by comparison to what the other tortfeasor did, it looks passive, relatively speaking? Because Judge Keenan asked you that question. I wasn't clear on your answer. I would argue both. I would argue that it is passive. And even if it is not considered passive, when you look at it against the other tortfeasor, who is more responsible here? Whose actions would constitute active negligence when viewed as a whole versus passive negligence? And I think it's clear that the actions of GeriCare were active negligence as opposed to passive or secondarily negligent. How can that be? I mean, we're kind of in some, it seems, fictional world where we're talking about conduct with a negligence label without using traditional elements like duty and breach and all that. But express warranty means you affirmatively did something. Now, you may say it's less. I get your argument that they did more. But you affirmatively put a warranty on the box that relates to the eyewash. That's not, that doesn't sound passive. If it was passive, you might be liable to implied warranties. You just start a distributor. But once you've done something, doesn't, haven't you done something active if you put an express warranty? That's necessarily active. And in order to put that warranty there, what we did was rely on the warranty from GeriCare. So what we were doing was not making our own new warranty about the product. We were not actively issuing a new warranty. We were accepting the warranty set forth by GeriCare as to its product and including it on our label of our product that then had their product inside with the same label. But what did they, and they did the same thing, right? No, we didn't. And they did a bunch of other stuff about, you know, holding themselves out and FDA. I got all that. But with respect to warranties and inspections or not inspections, I mean, y'all, they relied on someone downstream from them. Well, they did do their own inspection of the product. And they did their own testing of the product as well. That was after the problem came about, right? There was a, Your Honor, they, after receiving the bottle, they inspected the label. They did some, they testified as to doing some periodic testing of product that they received. After they received a report of contamination, they accepted their care aways report that there was nothing wrong with the product. But then subsequent to that, they did other testing. You're not suggesting, are you, that once there's a contamination problem, testing to try to see if there's something wrong with it in order to figure things out is testing, you know, is the same as testing beforehand, are you? That's like, that seems like a subsequent remedial measure or something like that. I can't imagine that. It seems like you would have to talk about pre-distribution testing. Factually, that's not exactly how it happened. Okay. So they had, on August 27, 2017, Jerry Care received a report of contamination from McKesson regarding a San Diego iBank issue. They responded to McKesson the following month stating that the manufacturer tested the product and concluded that it met specifications. That was the end of that. Then, for some reason, in October of 2017, Jerry Care had testing done by a third-party micro consult to make sure the integrity of the product was correct, that it was sterile, and to make sure they were selling quality products. But they testified at deposition that that was not in response to a report of any claim. They just were doing this as part of ensuring that the product was safe for their customers. And that discussion about that at Joint Appendix 458 to 459, and the report itself is at 598, then it's not until we have any further reports that we know of to Jerry Care until Stratus conveys a complaint to them a few weeks later. Okay. Ms. Lippincott, just one question. Under the restatement, are you saying that Stratus is a supplier, or are you necessarily saying it's a retailer? A supplier or a retailer. Are you drawing any distinction between the two with regard to the restatement? I'm sorry. I'm just going through trying to figure out what the distinction would be as between those two. I'm not sure that I can differentiate between those two, between supplier. So you're saying the supplier is the same as the retailer, or it's different? And I'm struggling with this. That's why I'm not suggesting it's an easy answer. Yeah, and I'm struggling with it as well, Your Honor. It seems to me that if you're not a retailer, you lose. Yeah, I think that we are more likely to be a retailer because we are providing it to the end user, the consumer of the product. Where we are in the chain, I would think that it would make us more of a retailer than a supplier. Okay, but then that kind of ignores the fact that you said that this was sterile eyewash, so you're not just selling it, you're making a representation. And most places where you buy products do make representations, where they place their products, how they describe it on the price tag below the item on the shelf. Okay, thank you. And I took too much time. I apologize. Thank you, Your Honor. All right. If Stratus had simply dropped Jerry Cares Eyewash into its surgical packs, I wouldn't be here today. But Stratus did so much more than that. They've tried to characterize Stratus' role as being passively negligent because they just passed through this product. But this Court has already recognized in the related appeal that Stratus did more than that. Well, how do you define passive negligence? It's just passing through the product. So moving the product from one entity to another. Okay, do you have authority for that under Maryland law? I don't. I don't. But that's the way I would see passive negligence. But I don't understand what's negligent about that. Yeah. Where's the negligence? Well, I mean, that's an excellent point. I mean, it would be negligent in the sense that you didn't do any testing of the product, any independent verification that the warranty that was made by someone else was, in fact, correct. So like a failure to detect. A failure to detect. So that's, you know, if you want to talk about nonfeasance versus misfeasance, for example. So the way that the passive negligence has been described is a failure to detect within the chain of distribution. But here we have something very different with Stratus. And what they did, and they described it as being less active. But under Maryland law, you don't look at degrees of fault. It's not are you more responsible than I am. It's whether your actions were active. And you look at the nature of the relationship and the actions and the legal duty owed by each party. We would not want to have a public policy that would give Stratus a pass under situations like this. That they could say whatever they want to the public or make representations to Care Link regarding the sterility of the product that they themselves have repackaged and marketed and talked about their expertise in this field and said that this is a high-quality product. Well, they're not getting a pass. I mean, they're responsible to the point of, I mean, so it's not, I mean, I hear your argument. But they're, I mean, they've already been held liable. And they got responsibility in that regard. Now, so the question is whether they come back and can get it against the, recover against the entity that supplied them the product that led to them being held liable. And that's what I was talking about. From a policy standpoint, yeah, that's probably not the, I mean, I appreciate your argument. We could probably make policy arguments both ways on that. But that, my concern is it's not a pass in terms of its liability to Care Link, in this case the plaintiff. But to say that, well, we're passively negligent. Just because you made, you, Jerry Care, made a representation that it's sterile, we don't have to do anything else. Even if we want to market this product ourselves to this field that we're an expert in and tell our customers and to the public that this is a sterile product without doing any testing and then say, sorry, we're passively negligent. We don't have to be liable to, or we don't have to pay liable for the judgment. We can pass that on to someone else. Or for our attorney's fees and defending the claims that were brought against us because of our negligence. And that's the pass that I'm talking about here that the court wouldn't want to encourage. In this case, it is clear that Stratis took greater steps than someone like Henry Schein, who is clearly a passive party in this, that transformed it from a passive party to an active party. It could have tested that product if it wanted to. It didn't have to include its own insert in the product saying that it was sterile and represented to Care Link that it was an expert in this field. Do you have a position in response to Judge Kenyon's question about whether Stratis was a supplier of the eyewash or not under the restatement of torts? I mean, I think it's both a supplier in the sense that it moves the product from one entity to another, but it's also taking greater steps in marketing this product by having its own label, by putting it into a surgical pack, by advertising and marketing itself as an expert in that field. It does much more than what a traditional surgeon would do. Well, the comment to the restatement says, the supplier of a defective channel is required to identify a retailer, regardless of whether his tort liability is based on negligence or strict liability, so long as the retailer has failed to discover the defect before selling the product. So, A, does that apply to us at all? And, B, where does Stratis fit into that if it does apply that rule? Yeah, it's not, I don't think it applies here in the traditional sense where you would have someone supplying a product to like a big box store who puts it on their shelf and sells it. That's not what Stratis did. They weren't a retailer in that situation. They were a supplier in the sense that they supplied this product to Care Link, but then also took the eyewash and repackaged it into a separate product that it itself marketed and sold to Care Link under a different warranty. And under that situation, Stratis is actively negligent and would not be entitled to indemnification. Thank you. Stratis did not repackage the eyewash. The eyewash was in a contained, closed, sealed bottle. That entire bottle was placed in our StratiPak along with numerous other products from other suppliers and manufacturers. We took that package and put a label on it to describe to the customer what we were providing them. And there's a listing that lists both products that are sterile on the outside of them and products that are not sterile on the outside of them because these are surgical packs that are used in the surgical field. And so when a StratiPak is opened, there's certain portions of it that are sterilized and there's portions that are not sterilized on the outside. For instance, the Jerry Care bottle. And so when you see the StratiPak listing, there is a list of sterile items and non-sterile items. And then within the list of non-sterile items, we have listed the sterile eyewash, which is what Jerry Care gave us, what they call their product. There was, in terms of the idea that we had some obligation to inspect or to provide a testing of this product, there is no basis to say that we failed to detect because we had no duty to test it. We'd looked at the bottle, made sure that the seal was intact. But other than that, we didn't open up the bottles and test them. We had no obligation to do that. And there's no authority to say that we did, in the position where we sat, to open up those bottles and test them. Jerry Care, however, does do that as part of their normal practice of testing the products that they receive and sell under their own label. So the actions of Stratis were passive or secondary to the active negligence of Jerry Care. And Stratis should be granted indemnification against Jerry Care for its active negligence. And so, Your Honors, I ask that you affirm the decision of the district court as to the granting of indemnification against Jerry Care and overturn the decision in terms of the award of attorney's fees that Stratis incurred in defending the underlying action against Carolin. Thank you. Thank you. We'll come down and greet counsel and then go on to our next case.
judges: Pamela A. Harris, A. Marvin Quattlebaum Jr., Barbara Milano Keenan